RENDERED: JULY 10, 2026; 10:00 A.M.
TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2025-CA-0257-MR

JEAN H. RAMSEY                                          APPELLANT


           APPEAL FROM HOPKINS CIRCUIT COURT
v.        HONORABLE CHRISTOPHER BRYAN OGLESBY, JUDGE
                 ACTION NO. 19-CI-00263


FRANK RAMSEY, III, AS
EXECUTOR OF THE ESTATE OF
FRANK V. RAMSEY, JR.; CLIFFORD
CECIL RAMSEY; FRANK RAMSEY,
III; FRANK RAMSEY, III, AS
TRUSTEE OF THE FRANK V.
RAMSEY, JR. IRREVOCABLE
TRUST AGREEMENT DATED
AUGUST 19, 2013; AND FRANK
RAMSEY, III, AS TRUSTEE OF THE
SARAH RAMSEY GST EXEMPTION
TRUST                                      APPELLEES

AND

NO. 2025-CA-0267-MR

CYNTHIA RAMSEY COOPER                            APPELLANT


           APPEAL FROM HOPKINS CIRCUIT COURT
v.        HONORABLE CHRISTOPHER BRYAN OGLESBY, JUDGE
                 ACTION NO. 19-CI-00263

FRANK RAMSEY, III, AS
EXECUTOR OF THE ESTATE OF
FRANK V. RAMSEY, JR.; CLIFFORD
CECIL RAMSEY; FRANK RAMSEY,
III; FRANK RAMSEY, III, AS
TRUSTEE OF THE FRANK V.
RAMSEY, JR. IRREVOCABLE
TRUST AGREEMENT DATED
AUGUST 19, 2013; AND FRANK
RAMSEY, III, AS TRUSTEE OF THE
SARAH RAMSEY GST EXEMPTION
TRUST                                                                    APPELLEES


AND


NO. 2025-CA-0440-MR


FRANK RAMSEY, III, AS
EXECUTOR OF THE ESTATE OF
FRANK V. RAMSEY, JR.; CLIFFORD
CECIL RAMSEY; FRANK RAMSEY,
III; FRANK RAMSEY, III, AS
TRUSTEE OF THE FRANK V.
RAMSEY, JR. IRREVOCABLE
TRUST AGREEMENT DATED
AUGUST 19, 2013; AND FRANK
RAMSEY, III, AS TRUSTEE OF THE
SARAH RAMSEY GST EXEMPTION
TRUST                                                           CROSS-APPELLANTS


CROSS-APPEAL FROM HOPKINS CIRCUIT COURT
v.        HONORABLE CHRISTOPHER BRYAN OGLESBY, JUDGE
ACTION NO. 19-CI-00263


-2-

CYNTHIA RAMSEY COOPER                                    CROSS-APPELLEE

OPINION
AFFIRMING IN PART, REVERSING IN PART, AND REMANDING

** ** ** ** **

BEFORE:  ECKERLE, A. JONES, AND L. JONES, JUDGES.

ECKERLE, JUDGE:  These three appeals raise numerous, familial issues with an irrevocable trust and a postnuptial agreement.  After considering the briefs, relevant law, and oral argument, we provide the following facts, law, and rulings.

## I.  RELEVANT FACTUAL AND PROCEDURAL HISTORY

The Trial Court record underlying these appeals is immense, consisting of 40 volumes of record filling four large boxes.  The parties' briefs have a combined length approaching 200 substantive pages.  In the interests of judicial economy, we shall provide only what we perceive to be the essential, underlying history.  Similarly, to avoid making this already-lengthy Opinion completely unwieldy, we shall not discuss each argument or citation to authority but will endeavor to provide a full analysis of the significant issues.  As we have previously done in similar situations, we "will discuss only the arguments and cited authorities we deem most pertinent, the remainder being without merit, irrelevant, or redundant."  *Schell v. Young*, 640 S.W.3d 24, 29 (Ky. App. 2021).

This combined appeal and the underlying cases stem from the union of Frank V. Ramsey, Jr. ("Husband") and Appellant, Jean H. Ramsey ("Wife"), who had been married for over 60 years when Husband died in 2018. Husband and Wife had three "Children": Appellant/Cross-Appellee, Cynthia Jean Ramsey Cooper ("Daughter"); Appellee/Cross-Appellant, Frank "Tripp" Ramsey, III ("Trustee"), who would become an Executor of the Estate and Trustee; and Appellee/Cross-Appellant, Clifford Cecil Ramsey.

In approximately 2011, Wife initiated divorce proceedings. However, in 2013 Husband and Wife entered into a settlement agreement ("the Agreement"), the net result of which would leave them remaining married but living separately. The Agreement provided specified assets to Wife, including two condominiums; two vehicles; jewelry; several bank accounts; various items of personal property; and a substantial, lump-sum, cash payment. Wife agreed that her receipt of that specific property constituted a "full and final settlement of all of her marital rights with respect to the restoration of non-marital property" and "the allocation of marital property . . . ." Trial Record ("R.") at 106. The Agreement stated that it "shall be binding" on Husband's and Wife's "respective estates, heirs, successors, assigns, and personal representatives." R. at 108. In the Agreement, Husband and Wife each waived the right to renounce the other's will. Relevant here, Wife also waived her dower rights. The parties attached a list of assets to the Agreement

-4-

("the List") "setting forth all of the property owned or controlled by the parties (both individually and jointly)." R. at 103.

Particularly at issue in these appeals, the Agreement also required Husband to allocate and distribute specified assets to Wife and then to create a trust for Children's benefit upon Husband's death. The Agreement describes the parties' intent to create an irrevocable trust ("the Trust"), as follows in full:

> It is the parties' express intention to transfer certain assets owned and controlled by Husband to an irrevocable trust for the benefit of Husband, for life, with remainder as Husband may appoint among his descendants (provided Wife consents to the appointment), and in default of appointment, for the equal benefit of the parties' three children, Frank V. Ramsey, III, Clifford Cecil Ramsey, and Cynthia Jean Ramsey Cooper (hereinafter "the children"), or if any child predeceases Husband, the descendants, per stirpes, of the deceased child. In furtherance of this mutual intent, to which both parties agree to be bound, it is agreed that within thirty (30) days of execution of this Agreement, Husband shall cause the 899.1 shares of Dixon Bank Stock and the approximately 1,248.68 acres of farm property in Webster County, Kentucky (listed separately on Exhibit "A" as "273.68 acres Lisman Road" and "975 acres, Webster County, Kentucky") to be transferred into the irrevocable trust ("Trust"), attached hereto as Exhibit "B", which Husband agrees to execute and deliver to Wife contemporaneously with this Agreement, and shall provide proof of same to Wife.

R. at 104-05.

The document creating the Trust was attached to the Agreement. The Trust begins by noting that Husband would serve as initial trustee and then names

Trustee as his successor. All first-person references in the Trust are understood to reference Husband, as the party responsible for legal creation of the Trust. Section 3.2 of the Trust provides that during Husband's lifetime, the "[n]et income of the trust will be distributed to" him. R. at 117. Article 5 of the Trust, titled "Division of Trust After My Death," substantively then provides in relevant part:

> 5.1 Division of Trust Assets. Assets administered by this Article will be divided in equal shares, one for each of my then living children and one for each of my deceased children with descendants then living, and held or distributed as provided herein.

R. at 118. Notably, the record makes clear that Husband and Wife negotiated the creation of the Trust, as well as what assets would be transferred into it, through experienced legal counsel while reaching the Agreement.

In 2014, approximately one year after execution of the Agreement, Husband executed his will, which explicitly states that it contains no provisions for Wife because she "has been provided for by a written agreement made during our marriage." R. at 133. Husband's will similarly states that it contains no provisions for Daughter "for reasons that need not be expressed herein." *Id.* Finally, Husband's will names Trustee as the personal representative, or Executor, of Husband's Estate and Children, or at least Trustee and Clifford, as the primary beneficiaries. Section two of Husband's will addresses the topic of Estate taxes by directing that his

death taxes, if any, be paid out of my residuary estate, other than apportionment property, without proration and my personal representative shall not seek contribution toward or recovery of any such payments. Death taxes means any estate or inheritance taxes, but not generation-skipping transfer taxes, imposed under the laws of any jurisdiction due to my death on any property passing by reason of my death whether or not such property passes under this will. With regard to apportionment property, my personal representative shall take such actions as are necessary to obtain reimbursement with respect to apportionment property, including withholding distribution. Apportionment property means (a) any property titled in the Frank V. Ramsey, Jr. Irrevocable Trust Agreement dated August 19, 2013, (b) any property with respect to which my personal representative may be entitled to recover federal estate tax under Internal Revenue Code Section 2207, 2207A, or 2207B . . . .

R. at 133-34. The second codicil also states:

This codicil is intended to clarify my intent in regard to paragraph 2 of my Last Will and Testament. It is my intent that my children pay to my estate the federal estate taxes owed on the inheritance they receive from me under [the Trust] . . . . As my estate will be required to pay the federal estate taxes owed on my estate within nine (9) months of my death, I direct my personal representative to receive reimbursement to my estate for such federal estate taxes at or prior to the time of filing my federal estate tax return.

R. at 141.

It is uncontested that at Husband's death in June of 2018, the Trust's

assets were valued at over $21,000,000, and the federal estate tax owed on those

-7-

assets was slightly over $6,000,000.  After Husband's death, Trustee assumed his roles as set forth in both the Trust documents and in Husband's will.

In March of 2019, Wife and Daughter (collectively, "Plaintiffs") filed a complaint against Trustee (individually and in his capacities as Executor of the Estate and Trustee) and Clifford Cecil Ramsey (collectively, "Defendants") in the Fayette Circuit Court.  Although both sons are named as defendants in the suit, a majority of the counts allege acts of breach, negligence, or fraud specifically by Trustee in administering either the Trust or Husband's Estate.  Because the particular language of many of these counts are at issue in the appeals *sub judice*, they will be discussed in detail at the relevant sections in this Opinion.[1]

Upon Defendants' motion, the Fayette Circuit Court transferred the action to the Hopkins Circuit Court, because Husband's Estate was being probated in Hopkins County.  Hereafter, references to "the Trial Court" are to the Hopkins Circuit Court.  Defendants also filed counterclaims against Daughter alleging that she had violated the "no-contest" provisions of the Trust and thus should be deemed to have predeceased Husband.  Moreover, Defendants sought a judgment

---

[1] Not all counts of the complaint have been raised on appeal, notably Counts VI, IX, and X.  The Trial Court issued summary judgment to Defendants on these counts, and they were not raised in Wife or Daughter's appeals.  Accordingly, they will not be discussed in any detail in this Opinion, except where relevant to the issues on appeal.

requiring that Daughter reimburse the Estate for the taxes owed on her share of the Trust's assets.

Over five years of litigation followed, in which the parties made numerous motions for dismissal, to file and amend counterclaims, and for summary judgment. As discussed below, many of the counts of the original complaint and the counterclaims were resolved wholly or in part by grants of summary judgment to one party. However, as of late 2024, the parties and the Trial Court determined that there remained issues on three counts of the complaint that would require submission to a jury. As the trial date on the remaining claims approached, Defendants filed a motion *in limine* seeking, among other requests, to exclude evidence of administrative fees paid to Trustee and of a previous grant of summary judgment to Plaintiffs that Trustee had breached the irrevocable Trust by delaying distribution of the Trust assets. The Trial Court denied the motions.

In December of 2024, the Trial Court conducted a jury trial on the remaining claims. After a multi-day trial that involved witness and expert testimony, as well as contentious motion practice over proposed jury instructions, the Trial Court submitted the case to the jury. Ultimately, the jury awarded Daughter $103,000 for Trustee's breach of his fiduciary duty and breach of the Trust.

In January of 2025, Defendants asked the Trial Court to include language in the final judgment directing Daughter to pay a sum slightly over $2,000,000 to Husband's Estate for her share of the taxes based on a previous grant of summary judgment by the Trial Court to Defendants on their counterclaim. Meanwhile, Plaintiffs' tendered final judgment reflected only the jury's verdict awarding Daughter $103,000 and omitted discussions of any other rulings for either side. The Trial Court issued the final judgment requested by Plaintiffs and denied Defendants' motion to include language directing Daughter to pay any amount.

These appeals followed. Case No. 2025-CA-0257-MR is an appeal filed solely by Wife challenging the Trial Court's summary judgment to Defendants on Counts I, VII, and VIII of the complaint, which largely involves Husband's alleged failure to disclose assets during the process of the Separation Agreement. Case No. 2025-CA-0267-MR is an appeal filed solely by Daughter that focuses on the Trial Court's conclusion that Defendants were entitled to seek reimbursement from her for her share of the taxes. Case No. 2025-CA-0440-MR is a cross-appeal filed by Defendants against Daughter, challenging numerous decisions made by the Trial Court.[2]

---

[2] Defendants also filed a cross-appeal against Wife, Case No. 2025-CA-0412-MR. However, in November of 2025, we granted Defendants' motion to dismiss that cross-appeal once Wife confirmed she did not seek to resolve any other claims on appeal.

Before turning to the merits of these appeals, we must first address Daughter's procedural argument that Defendants can only raise issues expressly contained in the final judgment and order denying Defendants' motion to alter, amend, or vacate because those are the only judgments specified in Defendants' prehearing statement. The version of Kentucky Rules of Appellate Procedure ("RAP") 22(C)(2) in effect at the time of the prehearing statement provided that a party was "limited on appeal to issues identified in the prehearing statement . . . ." The current version, which took effect on April 1, 2026, does not contain this provision.

It is a bedrock principle of appellate law that "one can only appeal from a final judgment and that all interlocutory orders or judgments are 'readjudicated finally' upon entry of a final judgment disposing of all issues making it unnecessary to name any judgment in the notice of appeal other than the final one." *Blair v. City of Winchester*, 743 S.W.2d 28, 31 (Ky. App. 1987). *See also* Kentucky Rules of Civil Procedure ("CR") 54.02(2) ("When the remaining claim or claims in a multiple claim action are disposed of by judgment, that judgment shall be deemed to readjudicate finally as of that date and in the same terms all prior interlocutory orders and judgments determining claims which are not specifically disposed of in such final judgment."). Thus, the final judgment

inherently encompasses the issues previously resolved by the Trial Court that Defendants seek to challenge.

Moreover, Defendants attached as exhibits to their prehearing statement numerous, contested rulings of the Trial Court. Defendants' notice of cross-appeal further mentions the decisions at issue, and Defendants attached copies of those decisions to the notice. We thus reject Daughter's limiting procedural argument and proceed to consider the merits of the appeals before us.

## II. STANDARD OF REVIEW

As noted in the procedural history above, the majority of issues on appeal in these combined cases relate to the Trial Court's grant of summary judgment on various counts in the complaint and counterclaims. We recently summarized Kentucky's familiar summary-judgment standards as follows:

> Summary judgment is governed by CR 56.03, stating that "if the pleadings, depositions, answers to interrogatories, stipulations, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact . . . the moving party is entitled to a judgment as a matter of law." In evaluating a party's entitlement to summary judgment, a Trial Court must view the record in the light most favorable to the nonmoving party. *Steelvest, Inc. v. Scansteel Service Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). If it appears impossible that the nonmoving party will be able to produce evidence at trial warranting a judgment in her favor, then summary judgment is proper. *Id.* (citing *Paintsville Hosp. Co. v. Rose*, 683 S.W.2d 255, 256 (Ky. 1985)) (stating that summary judgment "is only proper where the movant shows that the adverse party could not

-12-

prevail under any circumstances"). To combat summary judgment, the opposing party must present "at least some affirmative evidence showing that there is a genuine issue of material fact for trial." *Steelvest*, 807 S.W.2d at 482.

*Crowder v. Yussman*, 724 S.W.3d 772, 778 (Ky. App. 2025). "An issue of material fact is 'genuine' at the summary judgment phase when discovery has revealed facts which make it possible for the non-moving party to prevail at trial." *Kearney v. University of Kentucky*, 638 S.W.3d 385, 397 (Ky. 2022). "Determination that a fact is material or immaterial rests on the substantive law's identification of which facts are critical and which facts are irrelevant." *Id.* (citations omitted). We review the Trial Court's grant of summary judgment *de novo*. *Id*. at 398.

With this standard in mind, we will address the substantive law as necessary for each claim on appeal in the relevant portion of the Opinion. For the few issues where summary judgment is not involved, the relevant standard of review will be addressed individually below.

### III. ANALYSIS

**A. Wife's Appeal of Summary Judgment to Defendants on Counts I, VII, and VIII of the Complaint**

Because of the fundamental importance of the Agreement and the Trust to all of the combined appeals in this case, we must begin with Wife's appeal

from the Trial Court's grant of summary judgment to Defendants on Counts I, VII, and VIII of the complaint, which seeks to invalidate portions of the Agreement for breach of contract, fraud, or negligence by Husband. Although the other issues on appeal are not directly intertwined with this one, our decision on this issue significantly alters the factual posture of the case should we find in Wife's favor. Accordingly, it must be resolved prior to consideration of Daughter's appeal and Defendants' cross-appeal.

In order to examine the merits of Wife's appeal, we must review the terms of the Agreement and the process used to create the Trust. As part of the negotiation process, Wife and Husband, through counsel, identified assets that would be subject either to the filed divorce proceedings or the negotiated postnuptial agreement. Both Husband and Wife represented that they had examined the List and that it was "an accurate reflection of the property currently owned or controlled" by each. R. at 103-04. Similarly, the Agreement provided that, "after being duly sworn[,]" Husband and Wife "represent[] and warrant[] to the other" that the List "contains a complete listing of all known assets and debts, marital and non-marital, owned and owed by both of them." R. at 104.

The List contains numerous assets, such as "273.68 acres Lisman Road" (valued at $273,000) and "975 acres, Webster County, Kentucky" (valued at $3,500,000.00). R. at 113. The List also denotes ownership of a "1/2 interest

256.42 acres of mineral rights, Hopkins County" and "[m]ineral rights described in DB 624, page 150, Hopkins County[.]" *Id.* The List does not specify the value of either of those two mineral ownership interests; instead, the List simply states that each is "not valued[.]" *Id.* The List assesses the value of the properties that were to be transferred to the Trust at $13,663,100.

In the final version of the Agreement, Husband and Wife "waive[d] any further financial disclosures from the other." *Id.* Section 14 of the Agreement reiterates that Husband and Wife had each "made full and complete disclosure to the other of all assets and liabilities, both marital and nonmarital" and "based upon said representations, [they] have agreed to enter into this Agreement according to the terms thereof." R. at 108. However, that section also recognizes that "certain of the assets owned by the parties may be difficult to value . . . ." *Id.* Thus, the Agreement provides that "the fact that such assets could arguably have a different fair market value than heretofore understood or represented has been fully and adequately considered by the parties[,] and any such potential difference in value shall not be considered a failure to disclose the asset" or otherwise affect the validity of the Agreement. *Id.*

Nonetheless, the Agreement did not completely foreclose Husband and Wife from seeking relief in litigation. Section 15 provides in relevant part that if either Husband or Wife "has failed to disclose any property" or made a

"materially inaccurate" representation, then "the defaulting and/or breaching party shall be liable to the other for said default or breach." R. at 109. The breaching party must "indemnify and hold the other [party] harmless of and from any and all liabilities, claims, damages and expenses . . . arising out of or in any way connected with any such default, breach, failure to perform, misrepresentation or failure to disclose." *Id.* In Section 21 of the Agreement, "both parties acknowledge that they have been advised to obtain independent tax advice from a Certified Public Accountant regarding any tax consequences or filing obligations arising from the provisions contained herein." R. at 110.

In the complaint filed by Plaintiffs, Count I sought to enforce Section 15 of the Agreement and asserted that Husband breached the Agreement by failing to provide a full and accurate disclosure of assets, omitting certain mineral rights, and misrepresenting the value of others. The complaint specifically alleges:

> 52. The mineral rights for real property located in Hopkins County is listed as "not valued" in the [List] attached to the Separation Agreement. In connection with the Divorce Proceeding Frank V. Ramsey, Jr., submitted a Preliminary Verified Disclosure Statement . . . . Frank V. Ramsey, Jr., set forth in his Verified Disclosure that the mineral interests for said property had been mined to exhaustion.

> 53. Subsequent to the Separation Agreement being entered into Frank V. Ramsey, Jr., continued to receive substantial amounts of royalties for the mineral rights to the Hopkins County real property.

-16-

54. In the inventory for the Estate of Frank V. Ramsey, Jr., said mineral rights to the Hopkins County real property are listed and valued in excess of $600,000.00 by the Executor.

55. Frank V. Ramsey, Jr., further failed to assess any value to the mineral rights for the real property located in Webster County in the [List] attached to the Separation Agreement. Frank V. Ramsey, Jr.'s Preliminary Verified Disclosure Statement states that the fair market value of the real property is to be $3,500,000.00. Said value approximates the value set forth in the [List].

56. Following the death of Frank V. Ramsey, Jr. said mineral rights to the Webster County real property were appraised . . . as of the date of death of Frank V. Ramsey, Jr., for $3,824,000.00. In addition, said firm appraised the surface rights of the Webster County real property for $5.55 million as of the date of death of Frank V. Ramsey, Jr.

57. The omissions and representations by Frank V. Ramsey, Jr., were material in nature and constitute a failure to provide full disclosure in entering into the Separation Agreement.

R. at 84-85. Count VII sought to set aside portions of the Agreement that prevented Wife from renouncing Husband's will due to his alleged failure to disclose these assets. R. at 91-94. Similarly, Count VIII alleged fraud on Wife's dower interests for Husband's alleged failure to honor the agreement to treat all

three children equally while transferring significant assets into a separate revocable trust not subject to the provisions of the Agreement.  R. at 94-96.[3]

In 2023, Wife and Defendants sought separate summary judgment on Wife's claims in Counts I, VII, and VIII based on Husband's failure to disclose mineral rights.  As part of the extensive filings made by both parties in support of these motions, Wife submitted an affidavit asserting that she had relied upon Husband's asset disclosure when signing the Agreement and had not then known about the valuable mineral rights or payments for the land in Hopkins and Webster Counties.  R. at 3331-32.  However, the Trial Court granted summary judgment to Defendants on each of those counts of the complaint, holding:

> the express language, waivers and acknowledgements
> contained in the [Agreement] entered [into] between
> Frank and Jean Ramsey while represented by extremely
> competent and well[-]respected legal counsel on both
> sides, is controlling and precludes, as a matter of law,
> Plaintiffs' factually unsupported claims as to Counts I,
> VII and VIII of Plaintiffs' Complaint.

R. at 4193.

On appeal, Wife contends that the Trial Court erred in granting judgment to Defendants on her claims that Husband materially breached the

---

[3] Although each count also contains allegations of breach or fraud due to provisions in Husband's will regarding the reimbursement of Estate tax, Wife's appeal focuses solely on the grant of summary judgment based on Husband's alleged failure to disclose assets.  Accordingly, we will not address those tax issues in this portion of the Opinion and maintain focus solely on the issues raised on appeal of this particular judgment.

Agreement by failing to denote properly and completely the mineral-rights-based assets in the List. First, with regard to Webster County, she alleges that Husband entirely omitted his ownership interest in mineral rights, which were valued at approximately $3,800,000 after his death. Instead, Husband had only listed two parcels of Webster County land and valued them together at slightly over $3,750,000 without reference to any mineral rights. Wife asserts that she was entirely unaware of these rights when she signed the Agreement and that the Trial Court erred in failing to consider an affidavit she provided as evidence of this disputed fact. Second, regarding Hopkins County, Wife also contends that she relied on Husband's assertion in the List that mineral rights had only a nominal value because the land had been mined to exhaustion. However, she alleges that he collected over $3,300,000 in royalty payments from that land between 2011 and his death in 2018.

Wife argues that these two List omissions constitute material breaches, or at least a genuine issue of material fact as to the breaches, which should allow her to withdraw from "only the provision of the Separation Agreement where she relinquished her renunciation and dower rights." Wife's Reply Brief, p. 6. In other words, Wife does not wish to set aside the portion of the Agreement requiring creation of the Trust but seeks to alter the disposition of the remainder of Husband's Estate.

In return, Defendants assert that the evidence fails to establish that Husband intentionally failed to disclose assets or misled Wife as to their value. Instead, they contend that the evidence proves that Wife had knowledge that the properties in question could have contained valuable mineral rights but failed to pursue independent valuation or to take further steps to secure that interest if she chose. Since the only material facts at issue related to discrepancies in value that the Agreement foreclosed Wife from challenging, Defendants argue that the Trial Court properly granted their motion for summary judgment as to Counts I, VII, and VIII.

Although both parties moved for summary judgment on these counts, the Trial Court's grant of Defendants' motion means that we must review the evidence in favor of Wife as the non-prevailing party. However, we also note that Wife must still provide some affirmative evidence that there exists a genuine issue of material fact. *Steelvest*, 807 S.W.2d at 482. To support her claim that there are genuine issues of material fact precluding summary judgment, Wife primarily relies on the affidavit filed in October of 2023, which provides as follows:

> 6. During our marriage I was not consulted regarding financial decisions [Husband] made, including, but not limited to real property and mineral rights.
>
> 7. During the divorce proceeding I was provided with [Husband]'s Preliminary Verified Disclosure Statement

-20-

. . . . I read [Husband]'s Preliminary Verified Disclosure Statement and had no reason to question his assertions therein.

8. When I signed the Separation Agreement that resolved the divorce action, I relied on [Husband]'s Preliminary Verified Disclosure Statement which stated that the Hopkins County mineral rights had been mined to exhaustion and were of nominal value. When I signed the above mentioned Separation Agreement I further relied on [Husband]'s Preliminary Verified Disclosure Statement which document stated he was disclosing all assets in which he held an interest. When I signed the Separation Agreement I relied upon [Husband]'s disclosures regarding his finances and further relied upon those disclosures not failing to list any significant assets in which he held an interest.

9. I further relied on [Husband]'s preparation of the [List] attached to and incorporated into the Settlement Agreement. I relied on [Husband]'s preparation of the [List] disclosing all assets he held an interest in, and that he did not fail to disclose any significant assets he held an interest in.

10. As to the Hopkins County mineral rights, I did not question those being listed by [Husband] as "not valued" in the [List] because he had represented to me in his Preliminary Verified Disclosure Statement that they had been mined to exhaustion and were of nominal value.

11. At the time of entering into the Separation Agreement, I did not know [Husband] was still receiving royalty payments for the Hopkins County mineral rights.

12. At the time of entering into the Separation Agreement, I did not know there were substantial mineral rights associated with the Webster County property.

R. at 3331-32.  At oral argument, counsel for Wife asserted that the affidavit supports Wife's claim that she never possessed any true understanding of Husband's complex business and property interests during 60 years of marriage and that she had relied in good faith on his representations once the union was broken.

However, Defendants assert that the Trial Court correctly disallowed this affidavit as evidence due to conflicts between its contents and Wife's own previous deposition testimony offered in May of 2022.  During that deposition, Wife testified as follows:

> Q.  Were you aware during your marriage with Mr. Ramsey that he was receiving money for mineral rights for coal in property, real estate that he owned?
>
> A.  Was I aware?  I'm asking myself.  Was I aware of all this?  I don't know if I was aware or not.
>
> Q.  Let me rephrase the question.  Did you know Mr. – during your marriage did you know Mr. Ramsey was getting checks related to the sale of coal on land that he owned?
>
> A.  He probably told me.  I mean, I didn't –
>
> [Wife's counsel]:  Try to answer the question he asked; okay?  He's asking you if you knew.  If you don't – if you don't know, then just say you don't know.  If you do know, then –
>
> A.  I'm not certain.  I'm not.

Wife's Depo., pp. 28-29. Neither Wife's counsel nor Defendants' counsel asked pertinent follow-up questions to probe more specifically what actual knowledge Wife possessed or lacked regarding the mineral royalties. Notably, counsel for both parties encouraged a review of this deposition testimony in support of their positions. Although counsel for Wife asserts that the affidavit only clarifies the testimony offered in that deposition, a review of the transcript is most consistent with Defendants' interpretation that Wife clearly demonstrated no affirmative memory of whether she had knowledge of any of Husband's interests in mineral rights. Throughout her deposition, Wife frequently struggled to understand questions posed to her, and she generally testified that she had no specific recollection of specific pieces of evidence shown to her.

Although Defendants cited only federal cases to support their position that the Trial Court properly disallowed the affidavit, we have previously held that "[w]hile a post-deposition affidavit may be admitted to explain deposition testimony, an affidavit which merely contradicts earlier testimony cannot be submitted for the purpose of attempting to create a genuine issue of material fact to avoid summary judgment." *Gilliam v. Pikeville United Methodist Hosp. of Kentucky, Inc.*, 215 S.W.3d 56, 62-63 (Ky. App. 2006) (internal quotation marks, footnotes, and citations omitted).

Here, Wife's subsequent affidavit conflicts with her deposition testimony, where she averred that she did not know – one way or the other – whether Husband received mineral royalty checks during the marriage. By contrast, in the affidavit, which was not subject to cross-examination, she explicitly and conclusively stated that she had not been aware at the time of the Agreement that Husband was in fact receiving mineral royalties. Given the discrepancy between the deposition testimony and affidavit, we find the Trial Court properly concluded that the subsequent affidavit could not be used to create an issue of fact where none previously existed. *Id*.

Without the affidavit, the Trial Court was left to determine from the remaining evidence whether there existed a genuine issue of material fact as to breach of the Agreement. In order to show breach, Wife must offer some evidence that Husband failed to disclose the Webster mineral rights or provided a materially inaccurate representation of the Hopkins mineral rights. The Trial Court determined that the available evidence failed to do so.

Despite Wife's deposition testimony that she could not recall whether she had knowledge of any interest Husband had in mineral rights, Defendants have provided evidence suggesting that Wife did have previous knowledge of certain mineral rights prior to entering into the Agreement. This evidence includes Wife's signature on a Hopkins coal lease between Alliance Resource Properties, L.L.C.

-24-

and both spouses, as well as annual income from advance coal royalties with checks made out to both Husband and Wife. *See* R. at 2311-24 and 3783. Although counsel for Wife asserted at Oral Argument that this did not necessarily prove Wife's knowledge of the specific mineral right interests on the subject properties, the record contains no affirmative evidence to contradict the conclusion that Wife would reasonably have been aware of her own tax returns, bank statements, and legal filings, all of which include references to interests in mineral rights. R. at 2311-24, 3783, and 4282-83. Although the Trial Court did not have the benefit of all of this evidence at the time summary judgment was entered, the full record on appeal remains consistent with the conclusion that Wife did have knowledge of at least some of these interests at the time she signed the Agreement and that she had the opportunity to pursue further valuation prior to signing.

Similarly, regarding the Webster County property, no one disputes the lack of any active mineral leases on that property until 2018, approximately five years after the Agreement was executed. In June of 2023, Trustee submitted an affidavit about the Webster County mineral rights, averring in relevant part that:

> With the exception of a fractional interest in a dormant, non-producing lease dated 1970 on a 37-acre tract acquired by [Husband] in 1991, there was no coal or other mineral rights lease in place for any property owned by [Husband] in Webster County, Kentucky at the time the Separation Agreement was negotiated and executed. The 37-acre tract purchased by [Husband] in 1991 was not mined at any point and remained dormant

-25-

between his purchase and the execution of the Separation Agreement.

R. at 2447. At his deposition, Trustee was asked whether he knew the reasons that the mineral rights for the 975 acres in Webster County were not denoted in the List, and he answered in relevant part that "there was no lease, and mineral rights basically don't have a value until you have a lease." Trustee Depo., p. 147.

Indeed, Wife does not challenge the lack of an active lease for the Webster County land in the ten years preceding the Agreement. Wife also fails to identify clearly what additional valuation of that property Husband failed to provide. Kentucky tax law does not separately value unmined minerals that are "owned in their entirety by the surface owner" who is not "engaged in the severance, extraction, processing or leasing of mineral or other energy resources[,]" and the surface land is primarily being used for other purposes. Kentucky Revised Statutes ("KRS") 132.820(1). The mere fact, standing alone, that the property turned out to have profitable minerals under the surface – which were not mined until many years later – does not equate to Husband's foresight or secreting of otherwise disclosable information.

Ultimately, a breach of contract claim cannot succeed unless the contract has been materially breached. *See, e.g.*, *Barnett v. Mercy Health Partners-Lourdes, Inc.*, 233 S.W.3d 723, 727 (Ky. App. 2007). Wife has failed to meet that baseline, fundamental showing by her inability to establish that Husband

-26-

made material omissions regarding the mineral rights. At no point has Wife submitted evidence that Husband had access to any more information about the potential profitability of mining on any of the subject property than she had access to as his spouse – or equal bargaining partner across the table during separation proceedings. Both parties had access to information suggesting that mineral rights could be at issue on the subject properties, and in fact Wife requested changes in conveyance of the Webster property to the Trust to reflect the Trust's control over any future mineral rights on that land. Both parties had the opportunity to pursue independent valuation of all assets, including any potential mineral rights. And crucially, both parties had the benefit of excellent legal counsel and agreed to the provision that any subsequent discrepancy in assessed value of assets would not constitute a breach absent any failure to disclose or material misrepresentation.

Even if we accept Wife's assertion that she had little direct knowledge or understanding of Husband's business interests and property during their marriage, we find no error in the Trial Court's conclusion that the terms of the agreement preclude the recovery she seeks. Under Kentucky law,

> The construction and interpretation of contracts, including questions of ambiguity, are matters of law subject to *de novo* review. The primary objective in construing a contract is to effectuate the intentions of the parties. A contract must be construed as a whole, giving effect to all parts and every word if possible. Absent an ambiguity, the parties' intentions must be discerned from the four corners of the instrument without resort to

extrinsic evidence.  A contract is ambiguous if a reasonable person would find it susceptible to different or inconsistent interpretations.  The fact that one party may have intended different results is insufficient to interpret a contract at variance with its plain and unambiguous terms.

*AnyConnect US, L.L.C. v. Williamsburg Place, L.L.C.*, 636 S.W.3d 556, 561-62 (Ky. App. 2021) (internal quotation marks and citations omitted).  In this case, Husband and Wife entered into a postnuptial agreement, which Kentucky courts have long enforced under the principles of contract law.  *Davis v. Davis*, 489 S.W.3d 225, 227 (Ky. 2016); *see also Smith v. Smith*, 295 Ky. 50, 173 S.W.2d 813, 815 (1943).  As part of the Agreement, Wife waived "formal disclosures and discovery," declined "any further disclosures" from Husband, and voluntarily entered into the contract under advice of counsel with the affirmation that she "fully understood" all of its provisions.  R. at 104, 108, and 110.  These provisions are unambiguous, and there is no evidence that would cause us to disrupt them now.

Moreover, as counsel stated at oral argument, Wife never used the word "misrepresentation" in her deposition.  She did not seek to depose Husband before he died.  She did not hire an appraiser to look at the assets, even though the litigation dragged on for years.  She may think now that she made a bad bargain

-28-

then, but she has not shown it to be unconscionable.[4] Husband was wealthy before the marriage. Wife received a great deal of wealth through and after the marriage. Husband did not receive the assets; the Trust for the Children did.

Because the record shows no evidence of a genuine dispute of material facts at issue regarding Husband's alleged failure to disclose assets, we find that the Trial Court properly granted summary judgment to Defendants on Counts I, VII, and VIII. This alleged failure to disclose is at the heart of Wife's appeal. Without evidence establishing this portion of the claim, the Trial Court correctly concluded that Wife could not succeed on any of these three counts at trial, as she has not made any showing of fraud that would otherwise support the portions of each count on appeal. Accordingly, as to Case No. 2025-CA-0257, we affirm the Trial Court's grant of summary judgment in favor of Defendants.

---

[4] Counsel for Defendants referred us to a recent case decided by this Court with the caption *Lyons v. Lyons*, in which we held that the fact that one party may have entered into a bad bargain does not necessarily require that we find the resulting contract to be unconscionable. Oral Argument at 11:45:26. Although counsel did not offer a direct citation to this case, he noted that the Presiding Judge in this case also presided over the case in question. On review, we could find only one recent case with the caption counsel referenced, but it had a different Presiding Judge (Easton) and did not include the language used at oral argument. *Lyons v. Lyons*, No. 2024-CA-0507-MR, 2025 WL 2087517, at *1 (Ky. App. Jul. 25, 2025). However, similar language can be found in a recent Opinion issued by this Court and authored by this Presiding Judge. *Ivy v. Ontrac, Inc.*, No. 2024-CA-1275-MR, No. 2024-CA-1334-MR, No. 2025-CA-0429-MR, 2026 WL 1109120 (Ky. App. Apr. 24, 2026). While this case is not final and cannot be cited as binding authority, counsel does aptly observe that we are hesitant to disturb the results of a negotiated agreement simply because the terms tend to favor one party. This is particularly true in the case *sub judice*, where both parties had the benefit of experienced counsel in entering into the agreement.

**B. Defendants' Cross-Appeal of Summary Judgment on the Counterclaim that Daughter Violated the Trust's No-Contest Provision**

Having affirmed the Trial Court's issuance of summary judgment as to Wife's appeal and found no invalidation of the Agreement, we must next turn to Defendants' claim on cross-appeal that Daughter violated the Trust's no-contest provision. Because a ruling in favor of Defendants could disrupt all other rulings reliant on Daughter's status as a beneficiary of the Trust, we must first determine whether the Trial Court erred in finding that Daughter had not violated the Trust's no-contest, or *in terrorem*, clause. *See Commonwealth Bank & Tr. Co. v. Young*, 361 S.W.3d 344, 352 (Ky. App. 2012) (internal quotation marks and citation omitted) ("A no-contest clause provision in a will or trust is referred to as an *in terrorem* clause because its purpose is to strike fear into the heart of a beneficiary who might wish to consider contesting the provisions of the trust.").

The Trust's no-contest provision, Article 11(J), provides in relevant part that "any beneficiary of a trust who contests any of the provisions of this Agreement, or elects to take a statutory share of my estate, will be deemed to have predeceased me for purposes of this Agreement." R. at 128. After Plaintiffs filed their complaint in 2019, Defendants filed a counterclaim asserting that Daughter had triggered the Trust's no-contest provision. R. at 343. Although the Trial Court

did not allow portions of the original counterclaim seeking Estate tax reimbursement from Daughter, it denied Plaintiffs' motion to dismiss the no-contest portion of the claim in 2020. R. at 625 and 873. However, in March of 2021, the Trial Court granted summary judgment to Daughter on Defendants' claim that she had violated the no-contest provisions of the Trust.

On appeal, Defendants argue that Daughter challenged the existence and terms of the Trust in a variety of ways that should trigger the application of the no-contest provision, despite her stated intent that she sought only to enforce the terms of the Trust. At oral argument and in their Combined Briefs, Defendants identified at least three possible violations, which included: sending a letter to Alliance Coal directing that her third of the coal royalties be set aside for her and not proceed to the Trust; joining Wife's suit to invalidate portions of the Agreement; and filing to remove Trustee from her "portion" of the Trust when he had been named specifically as successor to Husband.[5] According to Defendants, Daughter's only recourse to enforce the Trust should have been filing an action for

_____

[5] The appeals contain recurrent references to Daughter's previously-advanced, legal theory that Husband's death had created three separate, equal trusts for each of the beneficiaries that contained each of their shares of the Trust assets. However, the Fayette Circuit Court, and later the Trial Court, ultimately decided this issue in Defendants' favor and issued summary judgment on any counts of the complaint reliant on that theory. As those rulings are not included in the appeals *sub judice*, this theory of separate trusts is noted only where relevant to discussion of the other claims before us on appeal.

declaratory judgment on whether grounds existed to remove the successor Trustee or to treat her portion of the assets as a separate Trust.

Ultimately, we do not find these arguments persuasive in establishing any issue of material fact or other grounds for reversing the Trial Court's grant of summary judgment. Kentucky precedent generally holds that filing an action to enforce the terms of a trust, including raising allegations of improprieties committed by a trustee, does not violate an *in terrorem* clause. *See, e.g.*, *Commonwealth Bank & Tr. Co.*, 361 S.W.3d at 352-53; *Ladd v. Ladd*, 323 S.W.3d 772, 780 (Ky. App. 2010). Under Kentucky law, no-contest provisions are strictly construed, and they are not extended beyond their express terms. *Hurley v. Blankenship*, 267 S.W.2d 99, 100 (Ky. 1954).

While Defendants argue that the method in which Daughter sought to enforce the Trust should invalidate her claim that she did not seek to set it aside, they have offered no evidence to support this claim. Although Wife's attempt to undo portions of the Agreement that prevented her from exercising her dower rights or from renouncing Husband's will would necessarily have an effect on the assets available to the Trust if successful, her complaint does not directly seek to unmake the Trust or to challenge the allocation of assets between the Children. Moreover, despite Defendants' assertions that Daughter might have benefited from these claims, both Wife and Daughter have consistently asserted that they made no

-32-

agreement that Daughter would receive any amount awarded to Wife if their suit should prevail. Defendants have not offered any evidence to the contrary other than general supposition. Finally, we do not find that any alleged impropriety in Daughter's actions regarding the Alliance Coal royalties constitute an attempt to invalidate the Trust, as Daughter requested control only over her share of the royalties and appears to have complied with the Trial Court's order to inform Alliance Coal that the practice should be stopped following the Trial Court's ruling that no separate trusts existed.

Based on the foregoing, we find that Daughter's suit sought enforcement of the Trust's terms, not to destroy or invalidate the Trust. Therefore, we affirm the Trial Court's conclusion that Daughter did not violate the no-contest provision. However, as will be explained in detail immediately below, we cannot affirm the full substance of the Trial Court's Order granting summary judgment due to unrelated language in its analysis of the case. R. at 1301-09.

**C. Defendants' Cross-Appeal of Partial Summary Judgment that Trustee Breached the Terms of the Trust**

After affirming the Trial Court's rulings in the first two major issues on appeal, we turn now to Defendants' primary assignment of error in their cross-appeal. Although they challenge a number of different rulings and decisions by the Trial Court, the interconnected nature of the numerous claims and competing

-33-

motions in the underlying cases means that a fundamental flaw with one ruling had the potential to permeate throughout the remainder of the case. Despite the Trial Court's diligent and concerted efforts to navigate the breadth and complexity of the issues before it, Defendants have identified a significant error that has unfortunately tainted many subsequent decisions that we must now attempt to unwind on appeal.

To identify the source of this error, we must turn to the Trial Court's Order granting Daughter's renewed motion for distribution of Trust assets issued in May of 2021. Although the Trial Court had previously denied a similar motion for distribution as premature, it noted that circumstances had changed materially with the March ruling that Daughter had not triggered the Trust's no-contest provision. R. at 1301. In issuing this Order, the Trial Court made a number of impermissible findings of fact, including several that echo the Trial Court's previous grant of summary judgment in 2019 that recovering taxes from Daughter and her share of the Trust would be a prohibited encumbrance and, therefore, violate the terms of the Trust. R. at 625 and 1304. More critically, and in addition to its improper attempt to decide the disputed facts, the Trial Court also made errors in its conclusions of law by finding the following:

> The language of the Trust provides for absolutely no
> contingencies or exceptions to distribution of assets
> provided none of the living children are in violation of
> the no-contest provision. It is impossible for the Trustee

-34-

to carry out these express terms of the trust when *he* attempts to impose a "lien" on the trust assets or when *he* demands the beneficiaries to reimburse the Estate for federal estate taxes paid prior to any distribution. Nevertheless, that is exactly what the Trustee has done for almost three (3) years since the death of Frank V. Ramsey, Jr.

. . .

Instead, the Trustee refused to distribute to Cynthia Ramsey Cooper her equal share of the trust assets unless she reimbursed the Estate of Frank V. Ramsey, Jr. for federal estate taxes paid that would be attributable to her share of the trust assets.

. . .

This Court agrees with Cynthia Ramsey Cooper that, by denying distribution in the first place and seeking reimbursement of federal estate taxes from the Irrevocable Trust and it's [sic] beneficiaries (especially prior to any disbursement or payment of federal estate taxes by the estate), the Trustee, Frank Ramsey III, abdicated his responsibilities and duties as Trustee, in favor of his role as Executor of the Estate of Frank V. Ramsey, Jr., of which he is a beneficiary.

R. at 1306-08 (emphasis in the original).

In June of 2022, Wife and Daughter filed a motion for partial summary judgment on Counts I and II of the complaint, which asserted that requiring reimbursement from Daughter's share of the Trust assets had impermissibly encumbered the Trust and caused the Trustee to breach its terms. At a hearing on this motion, however, Plaintiffs' counsel seemed to alter the thrust

-35-

of the pleadings by asserting that Trustee had breached his duty to the Trust by failing to distribute the Trust's assets more expeditiously.

The Trial Court issued a written Order in December of 2022 that incorporates findings from both the 2019 and 2021 Orders discussed above. In so doing, the Trial Court concluded that Husband had initially breached the terms of the Trust when he wrote his will to direct recovery of Estate taxes from the beneficiaries of the Trust. R. at 1972. The Trial Court further found that Trustee had also breached the terms of the Trust by carrying out that provision of Husband's will and refusing to distribute Trust assets to Daughter until she had reimbursed her portion of the taxes – in the face of Trustee's repeated and adamant denials that he had imposed such a condition. R. at 1973. Moreover, the Trial Court then declined to determine damages, as there had been no evidence submitted to establish any actual costs sustained by Daughter "between the time of the breach and the actual distribution of assets." R. at 1973.

Clearly understanding the wide-reaching impact of the Trial Court's decisions, Defendants repeatedly flagged errors and requested that the Trial Court either reconsider the ruling or make the Order final and appealable to enable them to seek interlocutory review before proceeding to trial. The Trial Court denied all of these motions. Defendants raised the issue again when requesting clarification of the Trial Court's denial of Defendants' motion for summary judgment on

Counts IV and V due to asserted outstanding issues of material fact, which the Court would not or could not articulate when requested. R. at 3791 and 4192. In many of these filings, Defendants explicitly noted the confusion that these rulings would ultimately create for the jury and the difficulty that they would cause in identifying the remaining questions expected at trial. *See* R. at 3769, 3852, 3860, and 4463. Further, as counsel for Defendants noted at oral argument, the Trial Court made findings of fact based entirely on its own previous Orders from 2019 and 2021, which were themselves not based on any evidence within the record.

Defendants have raised many times the concern that the Trial Court relied on a fundamental – and factually disputed – assumption since 2019 that Trustee conditioned distribution of the Trust assets on Daughter's reimbursement of her apportioned share of Estate taxes. However, this "fact" remains heatedly in dispute between the parties. In fact, Trustee provided sworn testimony explaining his reasons for the delay that are in direct factual conflict with the Trial Court's assumptions:

> Q. So prior to the commencement of this lawsuit, did you withhold distribution of the trust assets to [Daughter] until she agreed to reimburse the estate for the federal taxes paid?
>
> A. No, sir.
>
> Q. So again, the only reasons that you withheld distribution prior to this litigation being initiated was you wanted the acceptance and approval of the 706 form?

A. Yes, sir.

Trustee Depo., p. 198. Similarly, Trustee maintained in a sworn affidavit that:

> Neither in my capacity as Trustee of the Frank V.
> Ramsey, Jr., Irrevocable Trust, nor in any other capacity,
> have I ever imposed as a condition upon the distribution
> of Trust assets a requirement that a beneficiary reimburse
> the Estate of Frank V. Ramsey, Jr., for estate tax
> allocable to that beneficiary's share of Trust assets from
> the Trust assets themselves.

R. at 2079. Defendants also offered evidence of other factors for the delay in

distribution, such as the existence of a lien on the Estate's assets by the IRS "until

the Estate's tax liability was finally resolved." Cross-Appellants' Brief, p. 31 n.21.

Trustee may have been incorrect in his belief that no distribution of the Trust assets

could occur until the IRS accepted Form 706, especially because that form pertains

to Husband's Estate, not the Trust itself. Regardless, the sincerity of that belief is a

question of credibility for the jury to answer and is evidence of yet another genuine

dispute of material fact in determining whether a breach occurred.

In contrast, Daughter does not cite specific evidence directly

contradicting Trustee's affidavit or deposition, both of which occurred after the

Trial Court's summary judgment but before its denial of the motion to alter,

amend, or vacate it. Importantly, as counsel for Defendants noted at oral

argument, Daughter never testified during the jury trial that Trustee conditioned

disbursement on her tax payment. Rather, she argues that the Trust terminated as a

-38-

matter of law upon Husband's death, and Trustee was required to distribute the assets promptly regardless of any liens or tax issues. Daughter asserts that Trustee's violation in failing to distribute the Trust immediately upon Husband's death renders the factual dispute about his motivations for doing so irrelevant, even as she maintains that it is obvious that Trustee delayed distribution because he wanted something from her. Alternatively, counsel for Daughter suggested at oral argument that the plain language of the second codicil to Husband's will provided proof of this fact based on its instruction that Husband's personal representative take whatever steps necessary to recoup reimbursement from the Trust beneficiaries, up to and including delaying disbursement. However, this argument, at most, emphasizes the need to submit the factual question to the jury. And while the Trial Court did not grasp this point early, it should have seen the problem clearly, given the frequency and strenuousness of Defendants' objections. Instead, the Trial Court found that "summary judgment regarding liability [was] appropriate at [that] time" and that "there [were] no genuine issues of material fact related to the pending motion." R. at 1973. This statement is simply inaccurate.

Moreover, the assumption of only one factual motive for any delay in distribution is not the only area of concern in the Trial Court's rulings. In reading the 2019 and 2021 Orders quoted above, which the Trial Court incorporated in its Order granting summary judgment, the language clearly shows that the Trial Court

-39-

was persuaded that the Trust had terminated upon Husband's death. It then used this belief to classify the three years that followed it as an obviously unreasonable delay to distribute assets. But these continued errors served to compound the problems that we have already identified.

First, we must note that the Trial Court incorrectly concluded that the Trust terminated at the time of Husband's death. In reaching this conclusion, the Trial Court relied on a misinterpretation of *Forman v. Brent*, 309 Ky. 735, 218 S.W.2d 655, 657 (1948), *modified on denial of rehearing* (1949), to conclude that "[u]nder Kentucky law, in the case of a trust that pays income to a beneficiary for his life, and upon death distribution of the principal, the trust is deemed to terminate on the death of the life beneficiary." R. at 1308.

In *Forman*, a husband had left property and proceeds "in trust for the benefit of my wife, in lieu of her dower[.]" *Id.* at 736 (internal quotation marks omitted). Despite the trust's requirement that the property be sold upon the widow's death, the children/trustees "continued to control and manage" the trust's property for almost two decades. *Id.* at 737. When all children eventually died, a financial institution appointed as trustee sold the property, leaving a question as to the identity of the parties entitled to the proceeds and the timing – those alive when the widow died in 1929 or those alive when the property was actually sold in 1947. *Id.* Kentucky's then-highest Court resolved the question in favor of the persons so

entitled if the property had been sold upon the widow's death, as it should have been, noting that the will provided that: "At the wife's death the trust purpose had been fully accomplished, and it was terminated, except for the duty of the trustees to sell the property and distribute the proceeds. *See* Restatement of the Law, 'Trusts,' Volume 2, Section 334." *Id.* at 738.

Remarkably, we could not find that *Forman* has been cited even one single time by a Kentucky Appellate Court despite having been issued over 75 years ago. As the Trial Court and parties relied upon it, we must perform an independent analysis of the breadth of its holding. In reviewing the facts of that case, the *Forman* Court held that the trust terminated at the widow's death because on that date "the trust purpose [to provide income to the widow for her lifetime] had been fully accomplished . . . ." *Id.* at 738. It cited the RESTATEMENT (FIRST) OF TRUSTS § 334 (1935), which provided that: "[i]f by the terms of the trust[,] the trust is to continue only until the expiration of a certain period or until the happening of a certain event, the trust will be terminated upon the expiration of the period or the happening of the event."

Thus, it was not the death of the life estate beneficiary, standing alone, which caused the trust to terminate. Rather, the trust terminated because the death of the beneficiary caused the trust's purpose to have been fully accomplished. *Forman* neither broadly nor invariably held that every Kentucky trust involving a

-41-

life estate beneficiary terminates automatically as a matter of law when that beneficiary dies. Instead, the Court's much more modest holding was that there was no reason for that trust to remain ongoing after the widow died, and the language of the trust required its assets to be sold at her death.

To determine when a Trust's purpose has been fully accomplished, Kentucky law requires that we look to its maker's intent. As we have held, "the settlor's intent is controlling and is the polar star of all efforts to interpret the trust. Additionally, if the language used by the settlor is a reasonably clear expression of intent, then the inquiry need go no further." *Murphy v. Shehan*, 633 S.W.3d 350, 353 (Ky. App. 2021). If a trust lacks a statement providing its express purpose, as is the case with the Trust at hand, there is an "ancient, limited exception to the parol evidence rule whereby a court can examine extrinsic evidence to ascertain a trust's purpose." *Garland v. Miller*, 611 S.W.3d 275, 280 n.2 (Ky. App. 2020).

The Trust's language *sub judice* supports finding its creation for two purposes: (1) income to Husband during his lifetime; and (2) assets for Husband's and Wife's Children in equal one-third shares upon his death. The first purpose obviously was fully accomplished at his death. However, that purpose would appear to be secondary in nature here. As Husband was already the settlor, the life estate beneficiary, and the owner of the assets, Husband did not need to transfer assets to a Trust to enjoy income therefrom during his lifetime. Moreover, a letter

from Wife's counsel to Husband's counsel in August of 2013 essentially states that the Trust's purpose is for the three Children to share equally the designated assets upon Husband's death:

> Of primary importance to [Wife] (and hopefully [Husband]) is that the bank and the family farm in Webster County be left, unencumbered, for the children at [Husband]'s death . . . . [W]e believe the best way to accomplish this is through the present transfer of the property into an irrevocable trust.

R. at 2256. Similarly, Section 4 of the Agreement provides in relevant part that "[i]t is the parties' express intention to transfer certain assets owned and controlled by Husband to an irrevocable trust for the benefit of husband, for life, with remainder . . . for the equal benefit of the parties' three children . . . ." R. at 104.

These two purposes are not facially inconsistent with the Trial Court's conclusion that the Trust required distribution following Husband's death. However, the Trial Court's further conclusion that the Trust's purposes had been accomplished as of the date that Husband died ignores an important provision of the Trust itself. As discussed above, the Trust's no-contest provision provided one issue that had to be resolved prior to distribution of the Trust, as the language provided that any beneficiary who contested the terms of the Trust would be considered to have pre-deceased Husband. Additionally, the Trust contained a survivorship clause, which provided that a beneficiary who died within 90 days of Husband's death would be deemed to have predeceased him, and the beneficiary's

-43-

children would inherit his or her share. Accordingly, distribution to beneficiaries could not possibly have occurred until at least 91 days after Husband died because only then could the identities of the beneficiaries have been determined with any certainty. Thus, only after the 91st day after Husband's death could the purpose of the Trust become "fully accomplished." *Forman*, 218 S.W.2d at 738. The Trial Court's contrary conclusion cannot be affirmed.

The Trial Court's erroneous ruling makes the evidence of a factual dispute in whether the Trustee's delay of disbursement constituted a breach of the Trust even more difficult to ignore. Trust Section 9.1(O) provides that "after a trust Terminates . . . Trustee will . . . promptly distribute the remaining trust assets, and may not impose any condition (including, without limitation, filing a settlement or accounting or requiring a beneficiary to execute a release or indemnification) before doing so." R. at 124-25. Pursuant to the terms of the Trust, the Trustee could not even identify the proper beneficiaries for 90 days after Husband's death, which would have fallen in October of 2018. Plaintiffs filed their complaint in March of 2019, less than six months after the earliest date on which the Trust could have possibly terminated. After initiation of the suit and the allowance of a counterclaim that Daughter had breached the no-contest provision of the Trust, the Trial Court also denied distribution of Trust assets, finding that the

beneficiaries could not be determined until that question of law had been settled. Thus, the Trial Court itself also delayed the distribution here.

Given Trustee's consistent argument during the earliest period of litigation that filing the suit constituted a breach by Daughter of the Trust's no-contest provision, Defendants have offered more than a scintilla of affirmative evidence to present to a jury that it was Plaintiffs' initiation of litigation that prevented prompt distribution of the Trust assets. Although the Trial Court concluded that Trustee had impermissibly abandoned his Trustee role in favor of his role as Executor, the only substantial, supporting evidence that Daughter has cited is the language in Husband's will directing delayed distribution to compel reimbursement. She has not offered any affirmative evidence that Trustee followed or even intended to carry out this guidance or that he ever made any direct representation that distribution of the Trust assets would be dependent on tax reimbursement to the Estate. Construing the facts in favor of Trustee as the non-prevailing party, as Courts are required under the law to do, a jury could have found in Defendants' favor on a number of factual disputes, including the reasonableness of any delay, the motive for that delay, and whether that delay

could be considered part of a winding-up period given all of the facts surrounding the ongoing administration of the Trust.[6]

Because all of these concerns raise material issues of fact regarding the Trustee's alleged breach, we find that the Trial Court clearly erred in granting partial summary judgment to Plaintiffs on the issue of liability in Counts I and II of the complaint. We must reverse and remand for the jury to make these factual determinations, as should have been done by the Trial Court.

**D. Defendants' Cross-Appeal that Flawed Jury Instructions Tainted the Final Verdict for Plaintiffs on Counts II, IV, and V of the Complaint**

As a corollary, and as Defendants have repeatedly contended, the Trial Court's above-mentioned errors in granting summary judgment caused or at least resulted in wide-ranging additional errors before the jury trial on the remaining issues in Counts II, IV, and V of the complaint. Defendants again brought these issues to the Trial Court's attention in moving for clarification of the Trial Court's Order denying summary judgment on Counts VI and V, which alleged breach of fiduciary duties by Trustee and a negligence claim against

---

[6] *See also Beeler v. Fidelity & Columbia Trust Co.*, 293 Ky. 361, 169 S.W.2d 16, 19 (1943) ("'Although the time for the termination of the trust has arrived in accordance with the terms of the trust, the trustee does not thereby necessarily cease to be trustee, but he continues to be trustee until the trust is finally wound up. The period for winding up the trust is the period after the time for termination of the trust has arrived and before the trust is terminated by the distribution of the trust property.'").

Trustee in administering the Trust. However, the Trial Court could not understandably reconcile its conclusion that there remained factual issues for the jury to decide on whether Trustee had breached his duty to Daughter with its own finding that Trustee had "abdicated" his role in favor of his role as Executor. R. at 1308, 3791, and 4192. Because the Trial Court failed to correct its error in the partial grant of summary judgment on liability, we must now untangle the resulting effects of that error on the trial that followed.

In relevant part, Defendants find fault with the following instructions given by the Trial Court, which can be directly traced to the Orders from 2019, 2021, and 2022, discussed above:

**INSTRUCTION NO. 5**

Upon termination of the Irrevocable Trust, the assets were required to be distributed promptly with no conditions. The Frank V. Ramsey, Jr. Irrevocable Trust terminated the day that Frank V. Ramsey, Jr. died, July 08, 2018.

\*\*\*

**INSTRUCTION NO. 7**

When a trustee breaches a duty owed to the beneficiary they [sic] have also committed a breach of the Irrevocable Trust. The withholding for distribution for an unreasonable period of time until the assets were ultimately distributed constituted a breach of the Irrevocable Trust. Tripp breached the Irrevocable Trust by refusing to convey Cynthia's portion of the trust assets

to her without first being reimbursed for federal estate taxes.

**<u>INSTRUCTION NO. 8</u>**

By denying distribution of trust assets without first obtaining reimbursement of federal estate taxes from Cynthia, Tripp[,] as trustee, abdicated his responsibilities and duties as trustee in favor of his role as executor of the estate of Frank Ramsey Jr., of which he is a beneficiary.

R. at 4632-3635.[7]

In disputing the above jury instructions, Defendants raise substantially the same arguments that they have raised since the grant of partial summary judgment in December 2022, noting that the Trial Court usurped the jury's role as finder of disputed facts and also impermissibly instructed the jury to issue specific findings of fact. The record shows that Defendants raised concerns through both proposed jury instructions and a motion *in limine*, seeking to prevent any mention of Trustee's liability to the jury and returning to the jury questions of reasonableness and factual cause(s) for any delay in distribution. Daughter fails directly and substantively to address these errors in jury instructions. Rather, she maintains that the Trial Court's grant of summary judgment had already resolved any factual issues and that the Trial Court properly instructed the jury on those

---

[7] The preceding page is numbered 4634; the succeeding page is numbered 4646.

issues in the same way that it later instructed them on the finding that Daughter had not violated the no-contest provision.

Given the previously-discussed error in issuing the summary judgment that decided disputed facts in Plaintiffs' favor, we must determine the effect of the Trial Court's incorporation of that error into the jury instructions at trial. In recent years, our Supreme Court has returned repeatedly to the question of erroneous jury instructions, offering further clarification on the application of Kentucky's "bare-bones approach," which "means those that simply frame 'what the jury must believe from the evidence in order to return a verdict in favor of the party who bears the burden of proof.'" *Norton Healthcare, Inc. v. Disselkamp*, 600 S.W.3d 696, 723 (Ky. 2020) (quoting *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 824 (Ky. 1992)). Reviewing collected cases on this issue, the Court noted that:

> trial courts are called upon to engage in a balancing effort to ensure that jury instructions in Kentucky provide only the bare minimum necessary to ensure that the jury understands the ultimate issue of fact to be decided in any case, but still provide enough law and background knowledge so that the jury comes to a decision that is supported by law.

*Id*. at 723 (citations omitted).

In reviewing the underlying record, it is clear that Defendants highlighted, regularly and often, the conflicts that would occur in trying to instruct

the jury on the issues that had already been decided on summary judgment while asking them to make other highly-related factual findings. Their objections – strenuous and lengthy – were preserved. They tendered proposed instructions that the Trial Court declined to give.

Moreover, given the emphasis of bare-bones jury instructions in Kentucky case law, the Trial Court should have seen the readily-apparent red flag of its highly detailed and fact-specific instructions. Its significant unwillingness to adhere to this bare-bones principle in crafting the instructions, coupled with its inability to delineate facts to be decided by a jury should have alerted the Trial Court itself that a significant error had already occurred in the proceedings. If a Trial Court finds itself in the position of repeatedly instructing the jury on critical findings of pure fact, it has veered from its proverbial lane.

In order to review a jury instruction properly on appeal, we must consider whether the challenged instruction actually misstated the law to the jury.

> If the appellate court finds that the challenged jury instruction did misstate the law, a presumption of prejudice arises[,] and the challenging party is entitled to a new trial unless the responding party is able to show affirmatively that the error did not affect the verdict. In contrast, if the appellate court finds that the jury instructions did not misstate the law, no presumption of prejudice arises and the complaining party is only entitled to a new trial if she is able affirmatively to show prejudice, meaning that the error affected the verdict.

-50-

*Id.* at 724. The standard of review of a properly-preserved challenge to the substantive contents of a jury instruction is *de novo*. *Id.* at 710.

Here, we find that the Trial Court misstated the law to the jury in the challenged instructions by telling them erroneously that the Trust terminated when Husband died. The Trial Court ignored entirely the lawful survivorship period in determining the Trust's termination. Under these circumstances, Daughter assumes the burden of affirmatively showing that the error did not affect the verdict. Daughter has made no such showing, and indeed, we find that she cannot. Through this error, the Trial Court allowed the jury to impose damages for a period during which Trustee was not required to distribute assets. While the verdict was modest ($103,000 plus one-third of the administrative fees) when compared to the award Daughter requested ($2 million), it presumably includes alleged damages before the Trust legally terminated.

This error compounds the impact of the error in instructions seven and eight, particularly by stating that Trustee withheld distribution for an unreasonable period of time, thereby abdicating his duty as a trustee in favor of his role as executor of the Estate. The Trial Court should never have made this finding but should have allowed the jury to make the factual determination. As discussed immediately above, the record sets forth multiple questions of fact for a jury to resolve in determining whether the Trustee is liable, and, if so, what damages

actually resulted. However, the Trial Court's instructions treat these disputed questions as settled, directing the jury to find without deciding for itself that the Trustee had required Daughter to pay taxes prior to any asset distribution. The Trial Court required the jury to accept its own factual conclusion and left no avenue by which the jury could find otherwise. In so doing, and by instructing the jury that Trustee and Defendants acted wrongfully, there can be no doubt that the error impacted the verdict.

It is always error for a Judge to instruct a jury to discount contradictory evidence and accept as fact a matter that the parties dispute. Here, the amount of evidence that the Trial Court instructed the jury to ignore through this conclusory pair of instructions is significant. We cannot find it harmless that the jury was asked to decide whether Trustee "engaged in conduct which breached any of his fiduciary duties, including the duties listed in Jury Instruction No. 4" after being instructed that "Tripp breached the Irrevocable Trust by refusing to convey Cynthia's portion of the trust assets to her without first being reimbursed for federal estate taxes." R. at 4634 and 4638. Without this error, the jury might reasonably have found, based upon the conflicting evidence and subjective determinations of credibility, that Trustee did not withhold assets to force Daughter to pay. And even if the jurors found that Trustee violated the Trust by not promptly distributing the assets after the survivorship, they might have awarded

fewer, or even nominal, damages – especially since some of the delay was unquestionably caused by the Trial Court's own pausing of the distribution.

It is a long-settled position in Kentucky law that if it is unclear from the record that a verdict was "not probably influenced by an erroneous charge," then the appellate Courts must reverse the judgment. *Louisville Railway Co. v. Lenehan*, 253 Ky. 489, 69 S.W.2d 1017 (1934). In a case such as this one, where the Trial Court both usurped the jury's role as fact-finder and failed to identify correctly the date that the Trust at issue terminated, we must follow well-established precedent and reverse for a new trial with proper – and bare bones – jury instructions.

**E. Defendants' Cross-Appeal of the Trial Court's Rulings on the Reasonableness of Trustee's Fees**

Because we find the case must be remanded for a new trial on Counts II, IV, and V of the complaint, we must next address Defendants' claim that the Trial Court improperly denied its motion for summary judgment on Trustee's fees and its motion *in limine* to prevent submission to the jury of evidence of any fees charged by the Trustee in administering the Trust. Although the denial of summary judgment will be reviewed *de novo* as previously explained, we review rulings excluding evidence pursuant to the deferential abuse of discretion standard. *See, e.g.*, *Welsh v. Galen of Virginia, Inc.*, 128 S.W.3d 41, 54 (Ky. App. 2001).

Section 9.1(J) of the Trust allowed the Trustee to receive fees and gave him the power "[t]o charge administration expenses to income or principal. Any expense incurred by Trustee in safeguarding or in delivering trust assets, or in selling trust assets and then delivering the proceeds thereof, will be treated as an administration expense." R. at 123. Section 11(K) also generally provides that "[f]or services hereunder, Trustee will receive compensation in accordance with a regular schedule of fees in effect at the time such services are rendered; or if none, Trustee will be entitled to reasonable compensation." R. at 128-29. The parties have not pointed to such a schedule. However, there is an important limitation placed upon Trustee's right to receive compensation in Section 9.1(O), which states in relevant part:

> Trustee may continue to exercise any powers and any discretion hereunder for a reasonable period after the termination of any trust. *Provided, however, that after a trust terminates* or Trustee is removed, *Trustee will receive no compensation*, will promptly distribute the remaining trust assets, and may not impose any condition (including, without limitation, filing a settlement or accounting or requiring a beneficiary to execute a release or indemnification) before doing so. At Trustee's own expense Trustee may file a settlement or accounting so long as such does not materially delay or impede the transfer of the remaining trust assets.

R. at 124-25 (emphasis added).

This issue is, at its core, another dispute revolving around the timing of the Trust's termination. Trustee claims that the Trust terminated upon asset

distribution, while Daughter argues that the Trust terminated upon Husband's death. Under Daughter's interpretation and the Trial Court's erroneous adoption of it, which we have already rejected, Trustee was *never* entitled to receive *any* Trustee fees because he did not become Trustee until Husband's death. Like many of the other issues surrounding the reasonableness of Trustee's conduct and any delay in the distribution of the Trust, this dispute is one that is also properly for the jury to decide.

The record shows that Trustee received compensation for that role as follows: $52,539.78 on December 28, 2018 (R. at 4693); $109,618.80 on November 13, 2019 (R. at 4694); $110,211.85 on December 21, 2020 (R. at 4756); and $39,494.26 on May 17, 2021 (R. at 4757). None of those disbursements (totaling $311,864.69) occurred during the 90-day survivorship period. Because the December 2018 disbursement is not itemized, we cannot know what portion of the fees, if any, represent actions taken by Trustee during the survivorship. Consequently, the appropriateness of Trustee's fee awards is a question that is intertwined with the other factual questions in this case and not one that can be determined on summary judgment.

Accordingly, the Trial Court appropriately denied Defendants' motion. Similarly, the Trial Court did not abuse its discretion in denying Defendants' motion *in limine*, as evidence of the fees is a necessary component in

determining damages in the event that the jury had found Trustee liable (as opposed to the Trial Court) and that he had improperly awarded fees to himself. *See, e.g.*, KRS 386B.10-010. Accordingly, we affirm the Trial Court's rulings on this limited issue and conclude that this evidence should not be barred on retrial.

**F. Daughter's Appeal of Summary Judgment to Defendants on Amended Counterclaim to Recover Estate Tax**

Turning from the errors affecting the trial and most of the Defendants' assignment of errors on cross-appeal, we now must consider Daughter's appeal of the Trial Court's grant of summary judgment to Defendants that she owed reimbursement of taxes to Defendants as the beneficiaries of Husband's Estate. To do so, we must first review the procedural posture of the underlying cases on this question, as it has been the subject of multiple different rulings before the final grant of summary judgment.

Daughter first raised the question of reimbursement in Plaintiffs' original complaint, alleging that Husband's treatment of Daughter's share of taxes breached the Agreement:

> 48. Frank V. Ramsey, Jr. breached the terms of the Separation Agreement by not providing for the equal benefit of his three children under the irrevocable trust. Specifically, Frank V. Ramsey, Jr., included in his Last Will and Testament and 2nd Codicil provisions attempting to apportion federal estate taxes to the Trust's legacy assets and bequeathing other liquid assets to his sons to enable them to pay the estate tax on their share of

the Trust's assets, but not bequeathing any assets to Cynthia Ramsey with which to pay the estate tax on her share of the Trust's assets.

49. By imposing an encumbrance on the Trust's assets without bequeathing assets to his daughter with which to discharge it, Frank V. Ramsey, Jr., discriminated against Cynthia Ramsey and thereby breached the provision of the Separation Agreement which states that the assets of the Trust are to pass at his death for the equal benefit of the parties' three children.

R. at 83.

As discussed tangentially in the previous sections of this Opinion, the Trial Court's rulings regarding the Trustee's supposed breach of the Trust were directly connected to the Trial Court's agreement with Daughter's position that the reimbursement of the tax acted as an encumbrance of the Trust and would constitute a breach of the Agreement. R. at 629. Accordingly, the Trial Court initially denied actions filed by Trustee, as Executor of Husband's Estate, to seek a judgment that the Estate could seek reimbursement from Daughter for taxes.

However, once the Trial Court granted disbursement of the Trust assets in May 2021, Defendants filed a motion for permission to file a counterclaim against Daughter individually seeking to require her to pay her share

of the taxes under 26 United States Code ("U.S.C.") §§ 2205[8] and 2207B.[9]  The

Trial Court held a lengthy hearing on the motion and then orally and summarily

granted it.  Without further explanation, the Trial Court indicated that it believed

that the distribution of the Trust's assets had materially changed the situation.  The

---

[8] 26 U.S.C. § 2205 provides:

> If the tax or any part thereof is paid by, or collected out of, that part of the estate passing to or in the possession of any person other than the executor in his capacity as such, such person shall be entitled to reimbursement out of any part of the estate still undistributed or by a just and equitable contribution by the persons whose interest in the estate of the decedent would have been reduced if the tax had been paid before the distribution of the estate or whose interest is subject to equal or prior liability for the payment of taxes, debts, or other charges against the estate, it being the purpose and intent of this chapter that so far as is practicable and unless otherwise directed by the will of the decedent the tax shall be paid out of the estate before its distribution.

[9] 26 U.S.C. § 2207B ("2207B") provides:

> (a) Estate tax. −
>
> (1) In general.—If any part of the gross estate on which tax has been paid consists of the value of property included in the gross estate by reason of section 2036 (relating to transfers with retained life estate), the decedent's estate shall be entitled to recover from the person receiving the property the amount which bears the same ratio to the total tax under this chapter which has been paid as −
>
> (A) the value of such property, bears to
>
> (B) the taxable estate.
>
> (2) Decedent may otherwise direct.--Paragraph (1) shall not apply with respect to any property to the extent that the decedent in his will (or a revocable trust) specifically indicates an intent to waive any right of recovery under this subchapter with respect to such property.

Trial Court's written order merely stated that it had provided its reasoning at the hearing. However, recognizing the disparity between its current ruling and its previous rulings, the Order stated that "[a]ll inconsistent rulings in the previous Orders of the Court are set aside." R. at 1397.

The counterclaim, filed by both sons (Trustee in both his capacity as executor of Husband's Estate and individually), stated that the Trust's assets were worth almost $22,000,000, and the federal tax owed thereon was almost $6,200,000. According to the counterclaim, "[t]he net Estate Tax due has been paid[,]" and both sons "have each reimbursed the Estate for the net Estate Tax paid that is attributable to their one-third share (each) of the Irrevocable Trust from amounts that otherwise would have been distributed to them." R. at 1399. However, it claimed that Daughter "has refused to reimburse the Estate for the net Estate Tax paid by the Estate that is attributable to her one-third share of the Irrevocable Trust . . . ." *Id.* The counterclaim asserted that the Estate or both sons individually are entitled to reimbursement from Daughter of her share of the Estate taxes owed on the Trust's assets under 2207B, but it did not list a specific sum. R. at 1400-02. Paragraph 15 of the counterclaim stated that "[f]or purposes of clarity, the Executor states that he does not seek any relief from the Court with regard to any claim of reimbursement against the assets within the Irrevocable Trust itself." *Id.*

In November of 2021, the Trial Court granted Defendants' motion for partial summary judgment on their counterclaim. The Order does not provide any rationale, again noting that the rationale had been stated on the record during the 90-minute hearing. Therein the Trial Court had stated that the Trust's assets had been distributed unencumbered. Later, the Trial Court had stressed that 2207B was directly on point, and Husband had not indicated that he wished to waive his Estate's right to recover.

On appeal, Daughter contests the Trial Court's grant of summary judgment to Defendants on their counterclaim seeking reimbursement from her pursuant to 26 U.S.C. §§ 2205 and 2207B. The same standards previously discussed govern our review of that summary judgment decision. *Crowder*, 724 S.W.3d at 778; *Kearney*, 638 S.W.3d at 397-98. There does not appear to be a meaningful dispute about the facts here; instead, the issues are questions of law regarding the proper interpretation and application of the Agreement, the Trust, Husband's codicil, and federal taxation statutes. Specifically, the primary dispute between the parties is: (1) the meaning of the Agreement's and Trust's silence as to which party bears the burden of paying the Estate taxes, which both parties agree were anticipated at the time that both documents were drafted and signed; and (2) whether Husband had the freedom to direct reimbursement from the Trust beneficiaries without such being considered an impermissible encumbrance.

As a preliminary matter, we observe that neither the Trust nor the Agreement explicitly provided for Estate tax payments. Daughter's primary argument on appeal has been that Section 9.2 of the Trust provides that the Trustee has no power to "encumber" any assets of the Trust without written consent of the Children and that this provision was always intended to prevent any of the beneficiaries of the Trust from having to bear the burden of any Estate tax owed. However, Defendants maintain that the Trial Court correctly interpreted the silence of the Agreement and Trust as offering no bar to Husband's ability to arrange his Estate planning as he wished outside the clearly stated terms of those two documents. In so doing, the Trial Court further accepted Defendants' position that 2207B allowed reimbursement from Daughter as a Trust beneficiary.

As previously discussed, "[t]he construction and interpretation of contracts, including questions of ambiguity, are matters of law subject to *de novo* review." *AnyConnect US, L.L.C.*, 636 S.W.3d at 561-62. "Where a contract is ambiguous or silent on a vital matter, a court may consider parol and extrinsic evidence involving the circumstances surrounding execution of the contract, the subject matter of the contract, the objects to be accomplished, and the conduct of the parties." *Cantrell Supply, Inc. v. Liberty Mut. Ins. Co.*, 94 S.W.3d 381, 385 (Ky. App. 2002). Moreover, "[i]t is well settled law that a court may not add language to the written law to achieve a desired result." *Fox v. Grayson*, 317

S.W.3d 1, 8 (Ky. 2010). *See also, e.g.*, *Lee v. Kentucky Dep't of Corrections*, 610 S.W.3d 254, 262 (Ky. 2020) ("Furthermore, when the statute is unambiguous, courts are not free to insert words or add a provision even if it may be just or desirable to do so.").

Both parties refer us to these principles of contract interpretation and assert that accepting the other party's position would require us to add language to either the Trust or the Agreement to achieve their respective desired results. Similarly, throughout the pendency of the proceedings below and on appeal, both parties have pointed to communications between Husband and Wife prior to signing the Agreement to support their positions on the tax issue. These communications included letters showing that legal counsel believed that tax would eventually be due on the Trust assets, that Wife had negotiated through counsel that Husband would pay her share of yearly taxes, and that Wife knew that Husband's Estate would include assets other than those included in the Trust. *See* Response Brief for Appellees/Cross-Appellants in Case Nos. 2025-CA-0267 and 2025-CA-0440 at Appendix 4, 5, and 7.

Neither party points to any evidence in the record that suggests that either Husband or Wife misled the other as to any provisions for Estate tax or that either should have suspected that they had not reached the same conclusion about whether the Agreement and Trust settled the issue of which person or entity would

pay the expected taxes. Wife's deposition testimony, which is cited by both parties for numerous issues to support their interpretations of the original intent of the Agreement, makes clear that she assumed the Courts would "fairly" administer the law to bar recovery of taxes based on the provision that the Trust assets could not be encumbered. *See*, Jean H. Ramsey Depo., at 96. However, there is no evidence that she confirmed this understanding with her counsel or that this understanding was conveyed to Husband or his counsel prior to signing. In fact, the available evidence suggests that the parties did address the issue of identifying who would bear other tax burdens in the settlement process. *See* Response Brief for Appellees/Cross-Appellants at Appendix 4.

In this light, we do not find persuasive Daughter's argument that Kentucky law regarding the power of spouses to contract regarding taxes would control in this situation. While Husband and Wife could have included provisions in the Agreement waiving the operation of Kentucky and federal law governing the party responsible for paying Estate taxes, they did not do so. In the alternative, Daughter argues that ordering reimbursement should still be barred, because the very act of the Trustee seeking reimbursement from the Trust assets is still a breach of the Trust and Agreement, as the Trial Court initially held. However, this assertion is also unpersuasive given that the Trial Court ultimately issued summary

judgment on a different counterclaim altogether, which addressed the right of recovery from Daughter's assets individually after disbursement of the Trust.

Again, the complex, interwoven nature of the numerous rulings in these inter-related cases illustrates Defendants' prescient argument against distribution of Trust assets during the pendency of litigation. Defendants made the Trial Court and Plaintiffs very aware of their intent to appeal the Trial Court's adverse rulings once they were made final and that disbursement could materially affect the posture of other outstanding issues. However, Daughter repeatedly pursued disbursement, and she eventually won the relief she sought. Given the number of outstanding questions at issue in these cases and the lack of finality on multiple contested decisions, Daughter had significant advance notice that later rulings could result in adverse consequences once disbursement occurred. And despite Wife's seemingly accurate and harmless statement about Courts administering the law, laws and their applications are not always clear, which is one reason that the Judicial branch is entrusted with *interpreting* (versus enforcing) the law. While Daughter urges that we consider the assets still protected from encumbrance either by her status as a beneficiary of the Trust or by the notion that the Trust remained in existence somehow due to the ongoing litigation, thereby continuing to prevent its previous assets from encumbrance, she cites no compelling legal basis for these arguments.

Similarly, Daughter does not point to any convincing authority that would bar application of 2207B, which expressly allows Defendants to recover her apportioned share of Estate tax through its own application and the provisions of Husband's will. Quoted above, the statute specifically authorizes estates to recover the tax amounts from beneficiaries following life estates. U.S.C. § 2207B(a)(1)(A-B). As the Trial Court noted, this statute appears directly on point given the provision that the proceeds would provide for Husband for the remainder of his life before distributing the assets to the beneficiaries on his death.

Regardless of whether taxes can theoretically constitute encumbrances, "[u]nder Kentucky law,[10] federal estate taxes and Kentucky inheritance taxes are required to be shared proportionately by all of the beneficiaries in the absence of a specific direction in the will." *Houghland v. Lampton*, 33 S.W.3d 536, 538 (Ky. App. 2000) (internal quotation marks and citations omitted). However, Congress has promulgated statutes, such as 2207B, providing estate tax rules for "specific assets." 2 EST. TAX & PERS. FIN. PLAN. § 18:9. "Because of their specificity, these statutes override state law – a fact often overlooked by many drafters." *Id.* "The essential inquiry when deciding whether a statute is preempted by a federal statute or regulation is whether the state and

---

[10] "[T]he general rule . . . is state law [] determines who bears the ultimate burden of federal estate taxes on probate property." 2 EDWARD F. KOREN, EST. TAX & PERS. FIN. PLAN. § 18:9 *Apportionment of estate taxes* (Apr. 2025 Update).

-65-

federal law can coexist and be applied without conflict." *Housing Auth. of Covington v. Turner*, 295 S.W.3d 123, 127 (Ky. App. 2009).

Though she disputes the application of the federal statute, Daughter has not cited a specific Kentucky law directly overriding, or at least contradicting, 2207B. Daughter has also not shown a direct conflict between 2207B and the longstanding, similar, general rule under Kentucky law that "the share of each legatee which contributes or adds to the amount of the federal estate taxes and state inheritance taxes shall bear its proportionate part of those taxes, unless the will 'indicates' a contrary intent." *University of Louisville v. Liberty Nat. Bank & Tr. Co.*, 499 S.W.2d 288, 288-89 (Ky. 1973). *Accord, e.g.*, *Hale v. Moore*, 289 S.W.3d 567, 581 (Ky. App. 2008).

Alternatively, Daughter insinuates that Husband waived the right for his Estate to seek reimbursement of taxes under 2207B. But that statute provides explicit instructions as to the sole manner by which a decedent may waive its application. Specifically, 2207B(a)(2) provides unambiguous, plain language that the right to recover Estate tax obligations from the person receiving property "shall not apply with respect to any property to the extent that the decedent in his will (or a revocable trust) specifically indicates an intent to waive any right of recovery under this subchapter with respect to such property." Husband did not avail himself of this easily accomplishable waiver by Trust or will.

-66-

The Agreement and Trust were created after 2207 was enacted. Therefore, that statute's impact and applicability reasonably should have been known by Husband and Wife (each of whom was specifically advised to obtain tax advice in the Agreement). As Kentucky precedent has held for over a century, "the parties are presumed to know the law and contract with reference thereto, and that law becomes as much a part of the contract as if written in it." *City of Henderson v. Henderson Traction Co.*, 200 Ky. 183, 254 S.W. 332, 333 (1923). Thus, it was incumbent upon Husband to take specific, affirmative action if he wished to exempt his Estate from 2207B and upon Wife to insist that he do so if she wished to make the exemption a term of the Agreement. Either party could have added a clause in the Agreement or Trust to avoid application of the default taxation rule, but they did not.

Ultimately, the Trust does not explicitly discuss federal estate taxes, and it certainly does not state with specificity that Husband has waived the provisions of 2207B. Instead, the Trust specifies its intent that its assets be divided equally among the Children but contains no explicit discussion of payment of Estate taxes. It does not exempt the application of 2207B *sub silentio*. Furthermore, it is not unlawful that Husband provided mechanisms in his will for his sons to repay the Estate taxes but not for his Daughter. Parents often treat their children differently, and the law neither prohibits disparity nor mandates equality.

After all, gifts are not obligations. Free individuals are at liberty to distribute their assets as they choose. Kentucky has long espoused this principle:

> the law extends to the citizen a valuable privilege of disposing of his property, at death as he sees fit, and the courts jealously guard this right. By nature a will expresses the discriminating wishes of the testator. Inequality in the distribution of an estate by will is not in itself evidence of mental incapacity.

*Gerard v. Gerard*, 350 S.W.2d 719, 720 (Ky. 1961) (citations omitted). While Husband and Wife could have included additional provisions in the Agreement to add further requirements to Husband's Estate planning in addition to the provisions already contained in the Trust and Agreement, they did not. We cannot do so now in their stead. Absent such a provision, it would be unreasonable to construe a trust or agreement simply requiring assets be divided equally as including a silent (yet specific) waiver barring an otherwise applicable federal statute.

The only conclusion supported by the record is that Husband did not validly waive his Estate's right to seek reimbursement under 2207B. Thus, the default rule under 2207B and Kentucky law applies – the beneficiary pays his or her proportionate share of Estate taxes. Therefore, we affirm the Trial Court's decision to grant summary judgment to Defendants on this counterclaim, and we reject all of Daughter's contrary arguments in Case No. 2025-CA-2057.

**G. Defendants' Cross-Appeal of Final Judgment's Failure to Include Damages for Daughter's Apportioned Share of Estate Tax**

Having determined that the Trial Court appropriately granted summary judgment to Defendants on this counterclaim, we must next turn to Defendants' request that we direct the Trial Court to award a sum certain, as well as fees and interest, after the Trial Court failed to do so in either the grant of summary judgment or the judgment post final verdict. Daughter argues that the omission stems from Defendants' seeking only declaratory relief and failing to include a claim for monetary damages.

However, we note plainly that the very heading of the counterclaims seek "reimbursement" from Daughter, citing 2207B; and paragraph 14 specifically asserts that Trustee, as executor of Husband's Estate, is "entitled to reimbursement from [Daughter] of a monetary amount that bears the same ratio to the total Estate tax which has been paid as the value of the property received by [Daughter] from the Irrevocable Trust bears to the taxable Estate." R. at 1400. Further, the demand for relief at the close of the counterclaim requests, in addition to interest, costs, and attorneys' fees, a sum for the Estate taxes: "that are received by [Daughter] by way of her one-third share of the Irrevocable Trust." It also requests "[a]ll other relief to which they appear entitled." R. at 1402. Defendants' motion for summary judgment used virtually identical language. R. at 1508. Based on the clear

language of the counterclaims and motion for summary judgment, we cannot accept Daughter's assertion that Defendants sought purely declaratory relief or that they were required to amend their counterclaim.

We also reject Daughter's argument that Defendants' proposed judgment did not comply with the Trial Court's scheduling order, which required "dispositive motions" to be filed 30 days before the final pretrial conference. A proposed final judgment is not a dispositive motion, and summary judgment had already been granted here. Moreover, the scheduling order stated that the Trial Court would not consider "pleadings" filed after that deadline had expired. Under CR 7.01, a proposed judgment is not a pleading, which is defined as including only "a complaint, answer, reply to a counterclaim, answer to a cross-claim, a third-party complaint, and a third-party answer." *Anderson v. Cabinet for Health and Family Services*, 643 S.W.3d 109, 114 (Ky. App. 2022).

In reviewing the record, it appears that the counterclaim was not addressed at trial. Defendants' pretrial memorandum asserts that: "[t]he amount of that tax is not disputed. There are no issues of fact to be tried to the jury as to this claim." R. at 4466. Although the amount of tax is readily ascertainable from the available record, we note that Defendants waited over three years after the summary judgment order and after trial to seek a judgment against Daughter on their 2207B counterclaim, as well as prejudgment interest and attorneys' fees.

These claims were properly matters for the Trial Court to resolve, not matters for the jury. *Inn-Group Mgmt. Servs., Inc. v. Greer*, 71 S.W.3d 125, 130 (Ky. App. 2002) (attorneys' fees are an issue of law for the Trial Court). *See also, e.g.*, *Mo–Jack Distributor, L.L.C. v. Tamarak Snacks, L.L.C.*, 476 S.W.3d 900, 906 (Ky. App. 2015) ("the issue of whether attorney fees are recoverable is one exclusively within the discretion of the trial court and not properly submitted to the jury as an element of compensatory damages"). Likewise, as to prejudgment interest, it follows as a matter of course on liquidated damages, and it must be determined by the Trial Court on unliquidated damages. *Nucor Corp. v. General Elec. Co.*, 812 S.W.2d 136, 141-45 (Ky. 1991).

The Trial Court here made no determinations about reasonable fees or interest. To do so, it would need to rely upon the parties to provide appropriate documentation, such as affidavits or time logs. No party has directed us to a location in the record where such evidence was given or contested. "As an appellate court, we review judgments; we do not make them." *Klein v. Flanery*, 439 S.W.3d 107, 122 (Ky. 2014). We thus cannot make the initial determination of attorneys' fees and interest. Instead, we remand the matter to the Trial Court to issue a judgment for a sum certain in Defendants' favor on their 2207B counterclaim, which is to include a determination of prejudgment interest and fees,

if any. The Trial Court may, in its discretion, elect to allow discovery and/or an evidentiary hearing to resolve any disputes about the amount.

## IV. CONCLUSION

Given the complexity of the consolidated claims, we will address our holding in each appeal individually for clarity. For the reasons stated above:

In Case No. 2025-CA-0257, we affirm the Trial Court's grant of summary judgment to Defendants on Counts I, VII, and VIII of the complaint;

In Case No. 2025-CA-0267, we affirm the Trial Court's grant of summary judgment to Defendants on their counterclaim seeking reimbursement for the Estate of Frank V. Ramsey, Jr. and Defendants individually for Daughter's share of Estate taxes on the distributed Trust assets;

In Case No. 2025-CA-0440, we affirm the Trial Court's grant of summary judgment to Plaintiff that she did not violate the Trust's no-contest provision;

In Case No. 2025-CA-0440, we reverse the Trial Court's partial grant of summary judgment to Plaintiffs that Trustee breached the irrevocable Trust by refusing to distribute Trust assets until Daughter reimbursed the Estate for her apportioned share of the Estate taxes;

In Case No. 2025-CA-0440, we vacate the Trial Court's final judgment issued on February 20, 2025, and remand for a new trial with proper jury instructions, as outlined above;

In Case No. 2025-CA-0440, we affirm the Trial Court's denial of summary judgment to Defendants on the appropriateness of Trustee fees;

In Case No. 2025-CA-0440, we affirm the Trial Court's denial of Defendants' motion *in limine* preventing submission of evidence to the jury on the Trustee fees charged; and

In Case No. 2025-CA-0440, we remand to the Trial Court to issue a judgment for a sum certain in Defendants' favor on their 2207B counterclaim and to conduct any further proceedings necessary consistent with this Opinion.

ALL CONCUR.

BRIEFS FOR APPELLANT JEAN H. RAMSEY:

Daniel E. Hitchcock
Lexington, Kentucky

William G. Deatherage, Jr.
Hopkinsville, Kentucky

ORAL ARGUMENT FOR APPELLANT JEAN H. RAMSEY:

Daniel E. Hitchcock
Lexington, Kentucky

William G. Deatherage, Jr.
Hopkinsville, Kentucky

BRIEFS FOR APPELLANT/CROSS-APPELLEE CYNTHIA RAMSEY COOPER:

Daniel E. Hitchcock
Lexington, Kentucky

William G. Deatherage, Jr.
Hopkinsville, Kentucky

ORAL ARGUMENT FOR APPELLANT/CROSS-APPELLEE CYNTHIA RAMSEY COOPER:

Daniel E. Hitchcock
Lexington, Kentucky

William G. Deatherage, Jr.
Hopkinsville, Kentucky

BRIEFS FOR APPELLEES/CROSS-APPELLANTS FRANK V. RAMSEY, III AND RELATED PARTIES:

Thomas W. Miller
Elizabeth C. Woodford
Lexington, Kentucky

ORAL ARGUMENT FOR APPELLEES/CROSS-APPELLANTS FRANK V. RAMSEY, III AND RELATED PARTIES:

Thomas W. Miller
Lexington, Kentucky